Good morning. This next case is case number 4-16-0654, People v. William Beck. Appearing for the appellant is Attorney Lou Biverito. Is that how you pronounce your name, sir? Yes. All right, thank you. And for the appellee is Attorney Linda McClain. Mr. Biverito, you may proceed. May it please the court, Ms. McClain. Nearly three years ago, in October of 2014, William Beck was initially charged by a Coles County Sheriff's statute with driving while under the influence of alcohol in violation of Section 11-501A2 of the Vehicle Code. Several months later, the prosecution filed felony charges of aggravated driving while under the influence of alcohol in two counts. One count alleging a violation of 11-501A2 enhanced to a felony based upon the allegation that the violation was a proximate cause of great bodily harm to another motorist. The alternative count, same enhancement, only a charge of a violation of 11-501A1, driving when the alcohol concentration was over the limit. Several pretrial motions were raised and decided by the trial court. After the court ruled on those motions, the parties then proceeded to a trial based upon stipulations presented by both the prosecution and Mr. Beck concerning the charge alleging a violation of 11-501A1. The felony charge based upon 11-501A2 was dismissed. Those pretrial motions that were considered by the trial court before the case proceeded to trial, all primarily related to the admissibility of various forms of evidence that the prosecution intended to present. One of those motions had to do with incriminating statements attributed to Mr. Beck by the arresting deputy. And those statements were obtained by that arresting deputy while Mr. Beck was at Carl Foundation Hospital. The deputy reported that he arrested William Beck at 1.45 a.m., that he then read the warning to Mr. Beck, the warning to motorists to Mr. Beck at 1.45 a.m. The deputy acknowledged that prior to that he had informed the parents of Mr. Beck, who were present at the hospital, that he was going to charge William Beck with driving while under the influence of alcohol. He then separately informed William Beck that he was going to be charged with driving while under the influence of alcohol, obtained the driver's license of Mr. Beck, issued a citation for driving under the influence of alcohol, and then informed Mr. Beck that subsequent to an arrest on a charge of driving while under the influence of alcohol, you are hereby warned. And then warned Mr. Beck of the consequences of submitting to or refusing chemical testing. The primary issue during the pretrial motion hearing was whether Mr. Beck was in custody for purposes of Miranda at the time of the interrogation by the arresting deputy. The issue before this court relates to the manner of determining in custody. The trial court relied upon the factors enumerated by the Illinois Supreme Court in People v. Braggs. And the Supreme Court enumerated those factors when a trial court is making a custody determination when the person has not yet been arrested. Mr. Beck maintained that because the officer had informed him that he was being charged with and arrested for driving while under the influence of alcohol before the interrogation, and because at no time during the interrogation did the officer inform Mr. Beck of the rights under Miranda, that Mr. Beck was in custody. In the absence of a waiver of those rights, the incriminating statements that included statements with regard to consumption of alcoholic beverages and the times of consumption were inadmissible. Significantly, the Supreme Court in its Braggs opinion differentiated statements made before Braggs was informed of the arrest from statements made after Braggs was informed of the arrest. The Supreme Court ultimately ruled that both the pre-arrest statements and the post-arrest statements were inadmissible. However, the analysis of the factors enumerated by the Supreme Court to determine custody related only to the analysis of whether Braggs was in custody for purposes of Miranda before the arrest declaration. The court suggested that once a person is informed that the person has been arrested, there is no need for consideration of those factors to determine whether the person is in custody for purposes of Miranda. That analysis differentiating pre-arrest custody determinations from post-arrest statements for purposes of admissibility was also the subject of the opinion of the Supreme Court of the United States in Berkmer v. McCarty. Berkmer was arrested for driving under the influence of alcohol. Before the officer informed Berkmer that he was being charged with and arrested for driving under the influence of alcohol, the officer engaged in what's referred to as some preliminary roadside interrogation. And the Supreme Court in Berkmer determined that Berkmer was not in custody for purposes of Miranda during that preliminary roadside interrogation. However, the Berkmer court also determined, affirming the decision of the appellate court, that the statements attributed to Berkmer after the officer informed Berkmer that he was being arrested for driving while under the influence of alcohol were inadmissible. That's the situation with Mr. Beck. Mr. Beck was informed by the deputy that he was being charged with and arrested on a charge of driving while under the influence of alcohol. Yes, and that term is included in the phrase subsequent to an arrest for driving while under the influence of alcohol. So yes, when I'm referring to Mr. Beck being informed that he had been arrested, I'm simply relating the words that the officer used when he read the warning to Motors. What aspects of custody apply to a guy lying in a hospital room with his parents nearby? How is this a custodial interrogation, counsel? It's custodial just like a person standing at roadside. A person standing at roadside is an entirely different situation than a guy lying in a hospital bed. Well, I have to respectfully disagree. If that's your claim, then I guess we'll just move on. But I don't understand. You know, I understand from where Miranda came in dealing with coercive environments. Wasn't that one of the – where is the coercive environment to the benefit of the police when a guy is in a hospital bed receiving treatment? And we do respectfully disagree with each other on this point. However, in Berkimer – By the way, that wasn't a rhetorical question. Where is the coercive environment regarding a guy in a hospital bed? Is there anything you want to cite about that or respond to it? Sure. What is it? Just as in Berkimer, standing at roadside was not a coercive environment during the preliminary questioning. Standing at roadside, whether we want to call it a coercive environment or simply a post-arrest situation now, the Supreme Court held that the post-arrest statements standing in the same place that Berkimer was standing pre-arrest were inadmissible. Well, as he stands there at roadside, he's under the control of the officer. He's required to do what the officer directs him to do. Is that the same thing in a hospital room? Sure, and here's why. Oh, the deputy walks into the hospital room. He says, Doctor, you're treating him, but now I'm in charge. You go away. The facts are that the deputy obtained the driver's license. The deputy issued him a citation. Which he gave to the parents. I'm sorry? Which he gave to the parents. Several hours later. So neither the parents or William Beck knew that the citation said notice to appear rather than something about bond. But as a matter of law in Illinois, when a person is charged with a vehicle code violation other than a petty offense, bond is required. So the officer, the deputy, obtains the driver's license. The deputy issues the citation. The deputy tells the parents and Mr. Beck, you're being charged with DUI. The deputy then reads the document that says subsequent to an arrest for DUI, you are hereby warned. The deputy stays there with Mr. Beck for several hours, never tells Mr. Beck, you're not under arrest. Well, stays there, he was in and out of the room. But for the most part, he was there for several hours because he's awaiting the nurse to arrive to obtain the specimens for blood and urine testing. With his parents. Right. With his parents. And he asked permission to come in when he initially entered. Before he told the parents or anybody else that Mr. Beck was being charged with driving under the influence. Sure, he did. Because just as a courtesy, you would expect an officer to take precautions not to interfere with medical treatment that some patient is receiving when the patient happens to also be the subject of a police investigation. The point that I'm making with regard to location, if an officer tells you that you're under arrest. Well, but he didn't tell him that he was under arrest. You keep saying that. But that's not what the facts indicate. You've already noticed which says subsequent to arrest. The law is whether a reasonable person under the circumstances would believe that that person is not free to leave. A reasonable person without a background in the law, hearing an officer say subsequent to an arrest for driving under the influence would reasonably believe I've been charged and arrested for driving under the influence. So the fact that the document is a warning to motorists informing Mr. Beck of the consequences of submitting to or refusing chemical testing doesn't change the words that the deputy read to him and doesn't change the perception that a reasonable person would have hearing those words. So what you're saying is that regardless of the other factors that may contribute to a custodial environment, as long as the word arrest is in there somewhere, regardless of what its circumstance, then the defendant is under arrest. When an officer tells somebody you are under arrest or I'm informing you subsequent to an arrest, if the person were to attempt to leave, it seems as though that would be a basis for a charge of resisting or obstructing arrest. So to the reasonable person, yes, when an officer tells you, you effectively tell him. So because we're referring to language from the warning to motorists, that you have been arrested on a charge of driving under the influence, I submit that a reasonable person under those circumstances would believe that the person's not free to leave. Now, keep in mind that the cases that talk about these custody determinations, also in the context of post-arrest interrogation, talk about custody determinations in analyzing whether there was a curtailment of freedom comparable to an arrest or an arrest. They're alternatives. And that's the position that Mr. Beck takes, that once he was effectively informed, he's under arrest. Counsel, you challenged the admissibility of what could be called the blood draws of the hospital. And if I understand this correct, the nurse coach or testifaction performed a blood draw on the defendant shortly following his arrival at the direction of Dr. Hans, who's an emergency room doctor. Dr. Hans subsequently provided testimony to that same effect. Did you not? Dr. Hans and Nurse Coker said that the testing was conducted in the course of medical treatment. Dr. Hans went further, said based upon the nature of the incident rather than the nature of the injuries. And neither of them said that the testing was done in the regular course of providing emergency medical treatment. So what's the problem with their testimony for the foundation under the statute? The statutory criteria, specifically subparagraph one, specifically refers to admissibility when, in part, the testing was ordered in the regular course of providing emergency medical treatment. The testimony at the pretrial hearings was that the testing was not done in the regular course of providing emergency medical treatment. Nurse Coker was specifically asked, is there a regular procedure? And she was asked that in the context of the hospital protocol for lab testing. That protocol provides that the persons classified as red with the most serious injuries are to be tested for alcohol concentration. The persons with injuries classified as green, the least serious injuries, are not on that protocol for hospital testing. She was asked if the doctor followed the lab protocol, would there have been serum alcohol testing in this case? And the answer was no. She followed the protocol. There wouldn't have been testing. So a physician cannot exercise her independent judgment in ordering the test? For medical purposes, sure. And didn't that happen here? Isn't that what Dr. Hans testified to? Well, she testified that it was ordered in the course of medical treatment based upon the nature of the incident. She didn't say it was ordered in the regular course of emergency medical treatment. So for medical purposes … So these are the magical incantations that a physician must use when testifying in order to render the test she ordered admissible under the statute? That's what the statute means? That's what the statute says. Is there any authority for a physician that, quote, the regular course of providing emergency medical treatment, end quote, relates to a uniform standard applicable to emergency medical providers throughout the state? Yes. What is that? Cited in the brief. And during the course of one of the two pretrial motion hearings on that issue, exhibits were offered with regard to a provision of the Illinois Administrative Code that was based upon portions of the statute in Illinois that deals with the subject of what is an emergency, what is non-emergency, and what is medical monitoring. And those statutes … Those are in different contexts, though. Is there anything that says that that specific phrase in this statute relates to this uniform standard that you raised in the trial court? Only what I've cited in the brief and the language of the statute. If it wasn't to be some regular methodology, then the word regular is meaningless for purposes of admissibility in a DUI prosecution. The statute would only need to say that the test was ordered in the course of providing treatment. But the legislature didn't use those words. The legislature said in the regular course of providing emergency medical treatment. So the statute is clear regarding the language that was used. How about this as a distinction? The regular course is to distinguish it from a course of providing medical treatment where it might have been done, as you argued in other contexts, at the request of the police. Wouldn't that draw that distinction? That the doctors are doing the regular course for themselves as opposed to a course of treatment where it could have been for the police. I'm not sure I understand the question. In the regular course of providing treatment, the doctor doesn't order testing. No, in the regular course of treatment, we're talking about legislative intent. The intent was to distinguish between the medical personnel doing it and doing it because of medical reasons and doing a test because the cops asked for it. Well, the statute says in the regular course of providing emergency medical treatment and not at the request of law enforcement. So that and means that both of those elements have to be present. It has to be in the regular course of providing emergency medical treatment. And it cannot be at the request of law enforcement. So it's an interesting question. Theoretically, what if you have a physician who orders it in the regular course of providing emergency medical treatment but also orders it at the request of law enforcement? I'm not sure what the answer to that one is. But what we have in this case is evidence that it was not ordered in the regular course of providing emergency medical treatment and evidence, circumstantial evidence, that it was done at the request of the deputy who ultimately arrested William Beck. All right. Mr. Veparito, you're out of time. You'll have time and rebuttal. Thank you. Thank you. Ms. Klein. Thank you, Mr. Court. In response to my opponent, the State is arguing that the defendant was not in custody for purposes of Miranda when Deputy Clough talked to him in the hospital. This was not a coercive environment, and a reasonable person in his circumstances would not have felt compelled to make a statement. He was not formally arrested or restrained. Clough merely told the defendant he was going to charge him, not charging him with DUI. Future tense, not present tense. He gave him the warning to motorists, which talks about what happens civilly after an arrest with DUI, not criminally, so it would not prompt him to feel like he was in custody. The officer filled out a citation but gave it to defendant's parents. He was in emergency examination room at the hospital, a neutral environment. He was transported there by ambulance, not by the police. His mother and father were present. Clough was the only officer present, and he was in and out while they were doing procedures to the defendant. Clough asked defendant's parents and his staff for permission to talk to him. There was no sure force, such as weapons, indicia of formal arrest, such as booking, fingerprints, handcuffs, or guards. His freedom of action was not restricted. He was never told he was not free to leave the hospital or that he had to answer questions. The hospital staff was not instructed to restrain him or notify them when he was released. He was being treated in the emergency room just as any other patient in his condition would have been. Defendant does not suffer from an intellectual deficit or mental makeup that would affect his perception of whether he was free to terminate the conversation. The officer did not raise his voice, make threats, badger him, levy accusations, suggest the defendant was not free to end the interview, but merely made a general inquiry as to what had happened. The language used was more of a request than an imperative. So the state is arguing that under these circumstances, defendant was not in custody for purposes of Miranda and Miranda is not required. Case I cite in my brief, Vasquez, is pretty much on point. In that case, the reviewing court found that defendant was not in custody even though she had read Miranda, charged with DUI, and the focus of a criminal investigation. The reviewing court reversed and remanded the trial court's suppression of statements made to the police in defendant's room at the ICU, even though defendant's parents had been asked to leave the room during questioning and she had been previously charged with DUI. So she knew she was the focus of the investigation. The court stated the suspect's questioning in the neutral surroundings, such as the hospital room, does not face the same pressures as one questioning in a police-dominated atmosphere. In addition, even if the Miranda violation occurred in this case, an erroneous ruling denying defendant's motion to express would have been harmless. Defendant made inculpatory statements to several people at the crash scene. He told one of the paramedics he had drank five beers. He made other statements to the nurse before he made his statements to the officer. Given these other confessions, as well as the other strong evidence of guilt, including the results of the blood test and the retrograde extrapolation, the evidence in this case was not closely balanced. Ms. McClain, I want to jump ahead to an argument that was contained in the brief relative to the retrograde extrapolation evidence. Yes. Has any Illinois court recognized under the Frye standard the admissibility of that type of evidence? It has been talked about in several cases. In the Eichermann case, the 5th District in 2012, the Floyd case, the 2nd District in 2014, the Barnum case, the 5th District in 2003. I'm not sure exactly. I know that the Floyd case did not rule on Frye, or whether it was admissible by Frye. My question is limited to whether or not an Illinois court has approved this type of evidence after a Frye hearing, an appellate court. I think it has. It's a regular topic reported on in Illinois appellate court cases. I'm not sure if the actual Frye issue has been addressed in court. And that is my question. Would you like me to address the Frye issue in this case? We're maintaining that the retrograde extrapolation was properly allowed in this case under Frye. Scientific evidence is admissible under Frye if the methodology or scientific principle is sufficiently established to have general acceptance in a particular field. In this case, Wettstein testified that retrograde extrapolation is an accepted method within the field of toxicology. He had testified in court over 20 times on this topic, and he testified that there is a general consensus in the forensic toxicology community that retrograde extrapolation, when applied appropriately, is quite reasonable. Now his opinions in regards to retrograde extrapolation in the case of the Barnum were excluded. Is that on the 5th District case? I've got it. In the 5th District case, it was a man named Anderson. He was qualified to test blood samples for the presence of alcohol, but it wasn't Wettstein. It was a different person, and that's all he was qualified to do was test blood samples. In this case, we've got Wettstein. He's qualified by education, training, and experience. He was with Illinois State Police for 27 years and was a toxicology training coordinator for the Forensic Science Command for 12 years. He developed and implemented training programs in the areas of toxicology for new and old analysts as new technologies emerged. I mean, I think it's a fair inference from that that he was actually teaching retrograde extrapolation to other people. He had a bachelor's degree in biological sciences in 1987, a graduate course in pharmacology and training in toxicology training. He had testified 20 times or more on retrograde extrapolation the last time three weeks ago. He stays current on this subject by reading a monthly journal. I think he was very qualified to testify in this case. As for the foundation for his opinion, I think the major point made by my opponent in the reply brief, concerned whether he made an assumption about the elimination, whether he was in the elimination stage. And that was not an assumption. He testified within a reasonable degree of scientific certainty. He did not make an assumption that the defendant had entered the elimination phase by the time of the offense. He didn't merely assume that fact. His opinion was that the police reports indicated alcohol had been consumed after 7 p.m. The accident occurred at 8 p.m. and an hour was sufficient time, in Wettstein's opinion, for him to be in the elimination phase. And all of those facts were included within the stipulation, is that right? I believe so. This is what distinguishes our case from Floyd. In Floyd, Wettstein did not recall when the defendant started and stopped drinking and the testimony was devoid of any indication he considered any other information to determine if the defendant was in the elimination stage. So that was the major distinction between our case and Floyd. Are there any other questions? I don't see any. Thank you, Ms. McBride. Mr. Devorito, rebuttal? First, with regard to the argument that Vasquez parallels the circumstances present in Mr. Beck's case, Vasquez had been arrested on a charge of driving under the influence of alcohol, had been released from custody, was then at a hospital, and was then questioned and made incriminating statements. However, she was informed of Miranda, and she was also informed that she was technically free to leave. Those circumstances differ significantly from Mr. Beck's situation. Mr. Beck had been effectively informed that he was in the elimination stage. In the case of Blanfleth, which is cited in the brief, Blanfleth, like Beck, had been told, we have to charge you with DUI, was read the warning to motorist, informing him that he was free to leave. And in Blanfleth, the court determined that the charging declaration and the effective arrest declaration would cause a reasonable person to believe that the person was not free to leave and was accordingly under arrest for driving under the influence of alcohol. He was taken to the police station. He'd already been told that if he refused the field sobriety test that he was going to be arrested and failed the field sobriety test. He was taken to the police station. He was taken to the police station for field sobriety tests. It was after the field sobriety test that he was informed, we'll have to charge you with DUI, and read then the warning to motorist. Before the field sobriety test, he was told, if you fail these, we're going to charge you with DUI. Now, that I don't recall. I'll defer to Your Honor with regard to that. Counsel, you didn't address it to begin with, but I'm anxious to get your thoughts on this. You're arguing that the records were obtained here in violation of HIPAA? Yes. Hasn't the appellate court held, following other courts, that HIPAA doesn't apply to law enforcement and state attorneys? In certain circumstances. And probably the best example of that situation is the case in which the prosecution subpoenaed all medical records of the accused. And the court determined that the prosecution was entitled to records for the day of the arrest, because those records might provide evidence of the observation of medical personnel indicating that the person was impaired. What the appellate court didn't say there is that all of the records are admissible in evidence. Now, the Bauer case in the 5th District, doesn't the court there say that, though HIPAA provides for penalties against entities that fail to comply with its provisions, law enforcement agencies, including the Office of State Attorney, are not covered entities under HIPAA? There are exceptions under HIPAA for law enforcement purposes, and the question is whether this falls within one of those exceptions. Well, they said it's just not a covered entity. What did they mean by that? And rejecting the argument that they were. It's been a while since I was involved in that Bauer case, so my recollection is not crystal clear concerning that issue. But my recollection is that, under certain circumstances, law enforcement has access to information that is protected under HIPAA. What's the remedy provided for violation? There isn't a specific statutory remedy that I'm aware of. There is case law. I think it's the Wilbur case that says if the evidence is obtained in violation of physician-patient privilege, which I think is what Wilbur was directed to, that the evidence can be deemed tainted and can therefore be held inadmissible. Getting to this retrograde extrapolation opinion before I'm excused from the argument. It'll have to be very brief. And it will be. It was Fry in which Westine's opinion on retrograde extrapolation was deemed inadmissible. It was deemed inadmissible because. Floyd. Because he assumed that Floyd was in the elimination stage at the time of either the incident or the testing. I don't recall which one. But the relevant time would be the incident because what Westine has done every time he's testified, according to his testimony during the pretrial motions in this case, he's assumed. Is this contained in the stipulation? I'm sorry? Is all of this that you're saying contained in the stipulation? It's contained in the transcript of the testimony of Westine during the pretrial hearings. Is that properly before us? Yes. If it's not in the stipulation? It is because the issue was preserved for appeal, the ruling on the motion. Because the court initially, there were two hearings on retrograde extrapolation. The court first determined the state hadn't established the foundation for retrograde extrapolation. And then gave the state a second opportunity to try to do it. And specifically identified what the state would need to establish in order for retrograde extrapolation testimony to be admissible. And during that second hearing is when Westine testified. And the ruling on that motion was preserved for purposes of appeal. The ruling may have been, but by proceeding via stipulation, if your argument is carried through to its logical conclusion, the state would be precluded from presenting what might be a valid or sufficient basis for Dr. Westine's or Mr. Westine's opinion. But you went via stipulation. So you're saying that the state then is limited to what was presented at the time of the motion in limine. For this court to consider. Is that right? What I'm saying is if the court erred in ruling on the motion in limine. And a part of the stipulation was that the ruling on that motion in limine would be preserved for appeal. That it is properly before this court. Now with regard to qualifications. McCowan determined. I'm afraid we are going quite a bit beyond the allotted time here. You did include this argument in your brief. Counsel, thank you both. The case will be taken under advisement and a written decision shall issue.